STATE OF MAINE                                    SUPERIOR COURT

AROOSTOOK, ss                                     DOC. NO. HOUDC-CV 2012-90


ERIC D. BROWN, SR                          )
            PLAINTIFF                       )
vs.                                        )        ORDER AND
                                           )        DECISION
DEBORAH WARDWELL                           )
            DEFENDANT                       )


On December 21, 2012 Eric D. Brown, Sr., Plaintiff herein (hereafter referred to as Eric) filed a complaint against the Defendant, Deborah Wardwell (hereafter referred to as Deborah) asserting the following claims:
> Count I-Action to Quiet Title
> Count II-Declaratory Judgment Action
> Count III-Improvident Transfer of Title
> Count IV-Conversion
> Count V-Waste
> Count VI-Reformation of Deed

Trial on the matter was held July 13, 2016. Testimony was received from Eric, Deborah, Attorney Daniel Nelson and Anthony Bowers, and in addition deposition testimony of Jonathan Borkum, PhD.( Exhibit 5)

## FINDINGS OF FACT[1]

Eric is a 73 year old man with a complicated medical history related to a serious work related back injury. Over the course of several years he had multiple back surgeries, but remains to date in chronic pain, requiring medication. Eric was previously married and had five children, but the marriage ended in divorce in 2000. His children were not active participants in his life or health care in the years immediately prior to and including the

---

[1] Debra Wardwell, Attorney Nelson and Anthony Bowers were all found to be credible witnesses, with consistent versions of facts and it is their testimony along with the deposition testimony of Dr. Borkum and medical record of Dr. Thomas that was largely relied upon to make these findings of facts. Eric Brown's testimony was found less reliable. Although his timeline of events is generally consistent with that of the other witnesses, his testimony to specific details of events was often found unsupported or inconsistent, and otherwise unreliable.

JUDGMENT ENTERED

DATE: 10/3/16

1

time of events which are the subject of this case. Through those years he resided in Hammond Plantation, Maine.

In 2007, Eric was introduced to Deborah. They became friends and eventually began dating. Deborah would spend some evenings at Eric's home and they would sleep together. They developed a loving and caring relationship.

About six to eight months after they started dating, Eric proposed to Deborah and gave her an engagement ring which she accepted. Deborah then moved in with Eric at his Hammond Plantation home.

In 2008, Eric's grandson came to live with them. The grandson's presence resulted in added tension and created distance between Eric and Deborah. Eric suggested to Deborah she move out of his home, which she did. She also returned the engagement ring. After moving out Eric and Deborah remained friendly, but with the passage of time over the next year they had little contact.

At Christmas in 2009, Deborah sent Eric a card. This led Eric and Deborah to resume contact with one another in early 2010 and soon their relationship re-kindled. Deborah again began spending overnights at Eric's.

Through this time, Eric's relationship with his grandson soured and the grandson left the area. Up until the time he left, the grandson had also served as Eric's "caretaker", for which services he was paid by Eric's workers compensation insurer, One Beacon.

Upon departure of the grandson, Deborah began staying more frequently and eventually moved back into Eric's home. At Eric's suggestion she also assumed the role as "caretaker" and, as had the grandson, was paid for those services by One Beacon. When Deborah became the caretaker, Eric advised Deborah to set aside a portion of her payments for income taxes, which she did.

Upon moving back into Eric's home, Eric also returned to Deborah the engagement ring he had previously given her in 2007.

On July 5, 2011, Eric signed a Will and a Power of Attorney prepared by his attorney, Patrick Hunt. The July 5th, 2011 Will bequeathed Eric's entire estate to Deborah, and specifically made no provisions for any of his children. The July 5th, 2011 Power of Attorney was a general power of attorney and named Deborah as the agent. The powers of the agent enumerated in the document included the authority to make gifts to the agent. There is no evidence or findings of any undue influence being exercised by Deborah (or anyone else) upon Eric in the preparation or execution of either the July 5th, 2011 Will or Power of Attorney.

At Christmas in 2011, Eric gave Deborah a second ring, as a gift.

2

In early 2012, as Deborah prepared her income tax returns, she discovered she owed more in taxes than anticipated or set-aside. Upset, she discussed the issue with Eric. It was agreed Eric would pay the taxes owed to the IRS, $2641, and that Deborah would give to Eric the monies she had previously set-aside for her taxes, approximately $800. Eric authorized Deborah to pay her IRS tax bill from his checking account and to sign his name to the check. At the same time Eric instructed Deborah to start setting aside more money for her taxes, as he would not pay her taxes in the future.

Sometime in early 2012, Eric also added Deborah as a signatory on his checking account at Savings Bank of Maine and on his savings account at First Citizens Bank.

The medical evidence establishes that in early 2012, Eric's health and cognitive abilities were in decline. Eric was in constant pain, on several medications and increasingly depressed. His memory declined as did his functionability. He was referred to Dr. Borkum, PhD. for counseling and was also referred to Dr. Thomas for a neurophyschological evaluation. That evaluation was conducted in May, 2012.

The evaluation by Dr. Thomas establishes that in early 2012 Eric had significant deficits in his cognitive function, including memory, executive function and attention. The net effect was a decline in his general intelligence compared to his pre-morbid level. Dr. Thomas indicated in his evaluation that Eric could perform simple concepts, could make informed choices with simple tasks and that he demonstrated a fair appreciation for his cognitive weaknesses. It is also noted that at the time of the evaluation by Dr. Thomas and during the period of counseling with Dr. Borkum, Eric was still able to operate a motor vehicle independently. Although his activity level declined in 2012, he still performed a number of chores and activities independently including those that required the operation of his vehicle and attending meetings. Dr. Thomas' evaluation also reveals Eric was able to provide significant details regarding his prior history and current condition.

Neither Dr. Thomas nor Dr. Borkum directly states or opines that Eric was *incompetent* in 2012 or at any other time.[2] In fact, when addressing Eric and Deborah's relationship, Dr. Thomas wrote ..*it is unclear what her legal status would be should he become incapacitated.* This implies he was not incapacitated at that time. Also, Dr. Borkum's testimony suggests that in the Spring of 2012, early in his counseling treatment, Eric showed signs of improvement likely attributable to changes in medication and improved depression.

_____

[2] Dr. Borkum's testimony does raise question whether Eric could properly understand the legal implications by his signing a deed transferring his property; but the Court gives greater weight to the evaluation by Dr. Thomas in May 2012 as it is more temporally relevant. The Court also gives great weight to the testimony of Attorney Nelson who met with Eric several times to discuss his real estate and its transfer and who also took Eric's acknowledgment at the time he executed the deed.

3

Both Eric and Deborah testified that at the conclusion of the consultation with Dr. Thomas in May, 2012, it was suggested Eric get his personal affairs in order. Upon reviewing Dr. Thomas' report, it is not specifically written that he suggested to Eric to *get his affairs in order*, but Dr. Thomas did write that "..there may be benefit in assessing future need for guardianship or conservatorship. These probably are not necessary at the present time with Ms. Wardwell's oversight, however there may be issues in the future and they may be complicated in the absence of a legal partner." Regardless exactly what was said, Dr. Thomas had some discussion with Eric that prompted him to initiate steps addressing his personal affairs.

At no time since May 2012 to date has a conservator or guardian been applied for or appointed for Eric, nor is there evidence compelling the need for either.

After his consult with Dr. Thomas, in the Spring of 2012 Eric did in fact take steps regarding his affairs. Eric and Deborah met with Anthony Bowers, an undertaker and funeral home operator. Mr. Bowers provided Eric and Deborah with a number of options for funeral arrangements. Ultimately Eric and Deborah agreed on cremation, and Eric requested his burial site be in the Veteran's section. Mr. Bowers was paid in cash for both arrangements. While wrapping up the transaction, Deborah indicated she also wanted a graveside service, which Eric agreed to pay. The additional payment was made a few days later. Mr. Bowers provided no evidence suggestive that Eric was incompetent or did not understand the arrangements discussed or that he was unduly influenced. In fact, Mr. Bowers testified Eric seemed to understand the various options being considered.

Eric also met with Max Lynds at F.A. Peabody Insurance, where Eric had various insurance products including life insurance. Eric met with Mr. Lynds alone, and eventually cashed out a small portion of his benefits. Mr. Lynd's suggested to Eric he consult with Attorney Daniel Nelson regarding questions Eric had about any claims his ex-wife could make on his insurance and real estate.

Eric, Deborah and Attorney Nelson each testified consistently from which it can be found that Eric met with Attorney Nelson several times. Deborah was not present at any of the meetings except the last one on June 7, 2012 when she was present to sign the transfer tax form related to the deed, but there were no discussions between Deborah and Attorney Nelson. There is no evidence Deborah participated or exercised any influence of any kind regarding the matters Eric discussed with Attorney Nelson or the signing of the deed.

In addition to discussing with Attorney Nelson his concerns of claims by his ex-wife on his life insurance or real estate, Eris testified he also discussed with him his plans for his real estate. He was concerned about claims by his ex-wife. He testified at the hearing that he thought deeding the real estate to Deborah would put it *into trust* and protect it. Attorney Nelson's testimony was somewhat limited by his invoking attorney-client privilege, but Attorney Nelson confirmed that he fully explained to Eric the effect and operation of the deed, including the transfer to Deborah and a life estate reserved to Eric, and that they did not discuss conveying the property *in trust*. Again, Eric met alone with

4

Attorney Nelson several times. Attorney Nelson saw no reasons not to take Eric's acknowledgment.

On June 7, 2012 Eric executed the deed prepared by Attorney Nelson conveying Eric's real estate in Hammond Plantation to Deborah, reserving himself a life estate. Attorney Nelson took Eric's acknowledgement, and testified he felt Eric was competent to execute the deed and would not have proceeded otherwise. The evidence establishes that Attorney Nelson was solely Eric's attorney, and he had no attorney-client relationship with Deborah. The Court is satisfied, and so finds, that Eric appreciated the significance and implications of his execution of the deed to his Hammond Plantation property based upon Attorney Nelson's testimony of their several meetings to discuss the issue and his observations at the time he acknowledged Eric signing the deed.

On June 30, 2012, Deborah withdrew $1000 from Eric's savings account. There is evidence this money was withdrawn by agreement, and a portion of it was intended for Deborah's grandchildren. But when Eric asked Deborah to leave his home a short time later, the money was left in his desk.

In early August 2012, Deborah's mother died. As part of her arrangements, Deborah planned a family gathering at Eric's home to follow the funeral. This apparently upset Eric. Eric told Deborah she needed to find someplace else to live. Deborah moved out on August 4, 2012. This lawsuit was commenced in December, 2012.


## CONCLUSIONS OF LAW

### COUNT I
Count I was voluntarily dismissed by Eric. Hence, on Count I, judgment is entered for the defendant.

### COUNT II
In Count II, Eric seeks declaratory relief, specifically that the Court declare the deed from Eric to Deborah is void. Mental incapacity of a grantor alone is sufficient to rescind or void a deed. Bragdon v. Drew, 658 A.2d 666, 668 (Me. 1995). But, in the event of one who has not been deemed legally incompetent, the law generally presumes mental soundness and the burden to show incompetency rests on the party seeking to void the transaction. Id. In Drew v. Bragdon, the Law Court also indicated it agreed with Comment c to Section 15 of the Restatement(Second) of Contracts (1981), which provides helpful guidance when making such an analysis. Comment c states:

*Where there has been no previous adjudication of incompetency, the burden of proof is on the party asserting incompetency. Proof of irrational or unintelligent behavior is essential; almost any conduct of the person may be relevant, as may lay and expert opinions and prior and subsequent adjudications of incompetency. Age, bodily infirmity or disease, use of alcohol or drugs, and illiteracy may bolster other evidence of incompetency. Other facts have significance when there is mental illness or defect but some understanding: absence of independent advice, confidential or fiduciary*

*relationship, undue influence, fraud, or secrecy; in such cases the critical fact often is the normal pattern of similar transactions, and particularly inadequacy of consideration. Id.*

In this case there has been no prior or subsequent adjudication of legal incompetence regarding Eric. Eric is 73 years old and not in great health, historically of above average intelligence but in decline in 2012, and strong willed. There is expert opinion suggestive of incompetence by Dr. Borkum. But Dr. Thomas, whose evaluation of Eric the Court finds to be more persuasive, does not indicate incompetency. Dr. Thomas does make diagnoses regarding mental illness and cognitive decline but at the same time makes record of the numerous things Eric could do independently, all indicative of competence. There is also significant lay testimony of competence by Mr. Bowers and Attorney Nelson, based on first hand interactions regarding mildly involved matters. The evidence also includes descriptions of interactions Eric had with his insurance agent at the timeframe relevant to his claims. There is absolutely no evidence of undue influence, fraud or secrecy. To the contrary, the evidence shows after his appointment with Dr. Thomas, Eric undertook by himself to get his affairs in order. He met with his insurance agent, the funeral home operator and his attorney. Eric had a number of consultations with his attorney, attended only by himself. Attorney Nelson provides evidence of Eric making informed decisions regarding the transfer of his property to Deborah and capacity to execute the deed. The totality of these facts show an individual who was capable of making independent decisions and implementing them independently. And given his age, health and family circumstances, his decisions were neither irrational nor highly unusual.

The burden of proof to establish incompetence was on Eric. The Court finds he has failed to meet his burden. The request for declaratory relief is denied and judgment is entered for the defendant on Count II.

COUNT III

In Count III, Eric seeks to rescind the conveyance and transfer to Deborah pursuant to the Improvident Transfers of Title Act, 33 M.R.S.A. Section 1021, et. seq. Section 1022 states: *In any transfer of real estate or major transfer of personal property or money for less than full consideration.....by an elderly person who is dependent on others to a person with whom the elderly dependent person has a confidential or fiduciary relationship, it is presumed that the transfer or execution was the result of undue influence, unless the elderly dependent person was represented in the transfer ..by independent counsel. When the elderly dependent person successfully raises the presumption of undue influence by a preponderance of the evidence and when the transferee ...fails to rebut the presumption, the elderly dependent person is entitled to avoid the transfer..*

Section 1023 further provides that when a transfer of property by an elderly dependent person was the result of undue influence, the court shall grant appropriate relief to avoid the transfer, including rescission or reformation of a deed.

Eric's transfer to Deborah of his real estate was a transfer by an elderly person to one who he was at least partially dependent upon, and the transfer was clearly for less than

full consideration. But the Court also finds that Eric was represented by independent counsel when he made this transfer. Attorney Nelson represented only Eric. He did not represent Deborah in any way. So Eric is not entitled to the presumption of undue influence pursuant to Section 1022.

Nor is there evidence of undue influence being exercised by Deborah upon Eric to make the transfer. As previously discussed, the evidence indicates Eric independently made his decision to transfer his property, and implemented his decisions independently. Without the benefit of the presumption, Eric has failed to meet his burden of proof to establish the transfer was made pursuant to undue influence. On Count III, judgment is entered for the defendant.

COUNT IV
In Count IV, Eric seeks relief pursuant to a claim of conversion to have Deborah ordered to return to him $3641, which amount represents the $2641 Deborah took by way of writing a check on Eric's accounts to pay her taxes and $1000 she withdrew from the bank. A claim of conversion requires proof of the taking of property by a wrongful act. This claim fails for a number of reasons. At trial, Eric essentially withdrew this claim and indicated he did not want the money returned. But the Court will also address the merits.

At the time Deborah either wrote the check for her taxes, or withdrew money from Eric's account, she was the appointed agent on Eric's Power of Attorney which had been previously executed on July 5, 2011. The Power of Attorney included the right and authority to make gifts to herself, as Agent.

In addition, the Court finds that when each of these transfers were made, Eric was aware and in agreement. As for her taxes, Eric had earlier told Deborah to set money aside from her paycheck to pay her taxes. Deborah did so, but found she had not set aside enough. She discussed this with Eric, and Eric consented to helping her with the taxes this time but warned her to start setting aside more money as he would not do so again. As for the $1000 withdrawn from Eric's account, the Court again finds Eric was aware and consented to this withdrawal, and also finds credible Deborah's testimony she left the money in Eric's desk when he told her to leave his home in August 2012.

In summary, Eric has failed his burden of proof to show a wrongful taking by Deborah. On Count IV, judgment is entered for the defendant.


COUNT V
Count V was voluntarily dismissed by Eric. Hence, on Count V, judgment is entered for the defendant.


COUNT VI
In Count VI, Eric seeks to reform the deed from Eric to Deborah dated June 7, 2012 on the basis that there was a mistake of fact. For the reasons previously explained the Court

7

does not find any mistake of fact. Eric independently made decisions to put some of his affairs in order, including making funeral arrangements, speaking with his insurance agent and consulting with Attorney Nelson about his real estate. And he independently implemented the decisions he made. By all accounts, his transfer of his property to Deborah, reserving himself a life estate, was consistent with his discussions with Attorney Nelson. There is no evidence of a mistake. Accordingly, the Court denies Eric's prayer for reformation. On Count VI, judgment is entered for the defendant.

Dated: October 5 , 2016

_____
Justice, Superior COurt

8